STATE of Missouri, Plaintiff–
Respondent,

v.

Daryl DAVIS, Defendant–Appellant.

No. 62176.

Missouri Court of Appeals,
Eastern District,
Division Two.

Aug. 17, 1993.

S. Paige Canfield, St. Louis, for defendant-appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Millie Aulbur, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

PUDLOWSKI, Judge.

In April of 1990, Appellant Daryl Davis was indicted on fourteen counts of rape, four counts of sodomy, thirteen counts of burglary, one count of attempted rape, one count of attempted burglary, three counts of armed criminal action, and two counts of stealing. On April 23, 1992, a St. Louis County Circuit Court jury convicted appellant on four counts of rape, two counts of forcible sodomy, four counts of burglary, one count of attempted burglary, one count of armed criminal action and acquitted him of the other twenty-seven charges. Appellant was sentenced as a class X offender to concurrent life imprisonment terms for the four rape convictions; two life imprisonment terms for the sodomy convictions, with those sentences to run concurrently with each other but consecutive to the rape charges; fifteen years imprisonment on the four burglary convictions and seven years for the attempted burglary conviction, with those sentences to run consecutively to the life imprisonment sentences; and fifty years imprisonment on the armed criminal action conviction, with that sentence to run concurrent with the burglary sentences.

Viewing the evidence in the light most favorable to the verdict, only the five incidents on which appellant was convicted will be detailed. On September 30, 1987, Roberta L. was living alone in an apartment in St. Ann, St. Louis County. During the early morning hours, Roberta was awakened by appellant who was laying on top of her saying "Wake up, lady, wake up, lady." Appellant put a knife to Roberta's throat, told her that they were going to have some fun and warned her that he would kill her if she tried to look at him. Appellant turned Roberta from her side onto her stomach and raped her. He then asked her if she had any money or jewelry in the house and took her gold chains and money. When Roberta was certain appellant had left she called her boyfriend and the police. The police determined that appellant had removed a screen from a kitchen window to enter the apartment.

On November 26, 1987, Michelle F. was living alone in an apartment in Richmond Heights, St. Louis County. Between 4:00 and 5:00 a.m., Michelle was awakened by appellant pressing against her body and holding a towel over her face. Appellant ordered Michelle to roll over onto her stomach and asked if she had any money. Appellant told Michelle that he had a knife and then proceeded to remove her underwear. After failed attempts to penetrate Michelle while she lay on her stomach and again after forcing her up on her knees, appellant ordered her onto her back. He then raped her, continually commanding her not to look at him. When Michelle was certain appellant had left, she called her parents who called the police. It was determined that appellant had removed a screen from the kitchen window to enter the apartment.

On September 2, 1988, Beth H. was living alone in an apartment in University City, St. Louis County. In the early morning, she was awakened by appellant holding a pillow over her head. Appellant told Beth that he had a knife and threatened to kill her if she screamed or did not cooperate. Appellant ordered Beth to roll onto her stomach and take off her underwear. When Beth did not remove her underwear, appellant removed them and inserted his fingers into her vagina. Appellant then raped her. While Beth was still lying on her stomach, appellant demanded money. As soon as Beth was certain appellant had left, she called the police. Beth and the police determined that appellant entered the apartment through the living room window where a screen had been removed. Beth later identified appellant in a voice lineup.

On September 26, 1988, Rose H. and her daughter N. were living in an apartment in University City, St. Louis County. During the early morning hours, Rose and her daughter were sleeping in Rose's bedroom when they were awakened by appellant kicking open the bedroom door. Appellant lurched across the bedroom and landed on Rose. Appellant threatened, "Don't scream, Rose. I will hurt N." Rose struggled and instructed her daughter to crawl under the covers to the foot of the bed. Rose stopped

struggling with appellant when he began strangling her and threatened to hurt her daughter if she did not cooperate. Appellant ordered Rose to turn onto her stomach and raped her. After appellant left the apartment, Rose called the police. It was determined that appellant removed the screen from a living room window in order to enter the apartment. In 1990, Rose identified appellant in a lineup as the man who had entered her apartment and raped her.

On January 18, 1989, Kathleen D. was living alone in an apartment in University City, St. Louis County. Kathleen was awakened in the early morning hours by appellant jumping on top of her and grabbing her throat. Appellant warned Kathleen to be quiet and promised not to hurt her if she did not struggle, but still he placed a cold, hard object against her face. During a short struggle, appellant turned Kathleen on her stomach and pushed her face into a pillow. He asked her if she had any money. Appellant tied Kathleen's tee-shirt up over her head so that she could not see. After ordering Kathleen to "spread her ass," appellant unsuccessfully attempted to penetrate her. Appellant commanded Kathleen to flip over and then raped her. Appellant also attempted to suck Kathleen's breasts and touched her vagina with his fingers. Appellant warned Kathleen not to call the police because she would "embarrass" herself. Before appellant left, he stole several items from Kathleen's apartment. Kathleen called the police as soon as appellant left her apartment. It was determined that appellant entered the apartment after removing the screen to a window in the downstairs of the apartment.

A task force investigating the rape incidents developed a modus operandi (MO) on the suspect. The MO was that they all were early morning rapes, first floor of an apartment, entry through an open window or screen, victims were white women who lived alone or with small children, victims were lying asleep in their bed, and the sexual assault or an attempt occurred from behind. Appellant became a suspect after the evidence was reviewed and a print case made.

After appellant was arrested, he admitted to the police that the victims were all white women. He specifically recalled raping a woman who had a young girl in the same bed with her. Appellant drove around with the police and tried to recall where the rapes took place. A few of the places appeared familiar to appellant, however, he stated that his memory was not real clear because during that period of his life he had been heavily into drugs.

At trial, an expert witness for the state testified that DNA testing linked appellant to the crimes of all the victims except for Kathleen D. and Rose H. In those two instances there was insufficient seminal fluid to perform an adequate test. Appellant did not testify on his own behalf but did present two expert witnesses concerning DNA evidence. At the close of all the evidence, the jury acquitted appellant of twenty-seven counts and found him guilty on the other twelve, as detailed above. Appellant raises five points on appeal.

### I. Severance of Counts

In his first point, appellant argues that the trial court erred in overruling appellant's motion to sever the thirty-nine counts against him. Appellant contends the trial court abused its discretion, and that he was prejudiced by the trial court's refusal to sever the counts.

An appellate court reviews a claim for severance of offenses on two levels. *State v. Sims*, 764 S.W.2d 692, 696 (Mo.App.E.D. 1988). First, the court must examine whether the offenses were properly joined in the indictment. If joinder is found to have been proper, then this court must inquire whether the trial court abused its discretion in not severing the offenses and trying them together in a single prosecution. *Id.*

Missouri Supreme Court Rule 23.05 provides the following as to joinder of offenses:

All offenses that are of the same or similar character or based on two or more acts that are part of the same transaction or on two or more acts or transactions that are connected or that constitute parts of a

Liberal joinder of offenses is favored in order to achieve judicial economy, and the trial court's decision to join offenses should be based solely on the state's evidence. *State v. Olds*, 831 S.W.2d 713, 718 (Mo.App.E.D. 1992).

For joinder to be proper, the manner in which the crimes were committed should be so similar that it is likely that the same person committed all the charged offenses. *State v. Clark*, 729 S.W.2d 579, 581 (Mo.App.E.D.1987). Similar tactics are sufficient to constitute acts "of the same or similar character." *Sims*, 764 S.W.2d at 696.

In this case, the similar tactics appellant used were those contained in the MO. All of the victims were white females living alone or with small children in apartments in St. Louis County. All of the crimes were committed in the early morning hours. In eleven of the fourteen crimes, appellant gained access to the victims' apartments by removing a screen from a window. In each instance, appellant initially had his victim lie on her stomach and then either raped her while she was in that position or, if he was unsuccessful in penetrating the victim, forced her onto her back. Also, appellant asked for money or jewelry from eleven of the victims. Because the acts committed against the fourteen victims were of the same or similar character, it is likely that appellant committed all the charged offenses. Joinder was proper.

Thus, denial of a motion to sever will be set aside only if the trial court abused its discretion. Appellant must also make a clear showing of substantial prejudice. *Olds*, 831 S.W.2d at 719. In determining whether to grant a motion to sever, the trial court weighs the benefits of trying the offenses simultaneously and thereby saving judicial time against the potential prejudice to appellant. *Id.* In assessing prejudice, the court should consider, among other relevant factors, the number of offenses charged, the complexity of the evidence to be offered and whether the jury is able to distinguish the evidence and apply the law intelligently to each offense. *State v. McCrary*, 621 S.W.2d 266, 272 (Mo. banc 1981).

In this case, thirty-nine counts arose from fourteen separate incidents. Although a large number of crimes were charged, the facts relevant to each incident were not complex. The evidence bearing out these facts consisted of testimony from each victim and investigating officers. The state's DNA expert addressed all the incidents, but separately discussed each victim's DNA samples. Although DNA matching is a technical area of expert testimony, the concept of matching up one DNA sample to another, like fingerprinting, is easily understood.

Furthermore, the elements of each offense were clearly set out in separate instructions for each offense. Also, because appellant was convicted of only twelve of the thirty-nine counts, we are persuaded that the jury was able to distinguish the evidence and intelligently apply the law to each offense. *See Olds*, 831 S.W.2d at 720. The trial court's decision to save judicial time by trying the offenses simultaneously did not prejudice appellant and was not an abuse of discretion.

## II. DNA Evidence

Appellant argues, in his second point, that the trial court erred in overruling appellant's motion to suppress DNA evidence without granting a hearing under *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), to determine whether DNA testing is generally accepted in the scientific community. In denying appellant's motion, the trial court found that a *Frye* hearing was not necessary because in *State v. Davis*, 814 S.W.2d 593 (Mo. banc 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992), the Missouri Supreme Court recognized that DNA testing is generally accepted in the scientific community. Appellant contends that the trial court interpreted *Davis* in an overbroad manner and improperly denied appellant a *Frye* hearing.

The trial court has discretion to admit or exclude an expert's testimony. *Davis*, 814 S.W.2d at 603. Missouri still adheres to the *Frye* standard of "general

acceptance" in the scientific community to determine the admissibility of results of scientific procedures.[1] *Id.* at 601. The *Davis* court's conclusion that DNA testing was generally accepted in the scientific community was supported by an extensive review of the case law and the current literature. *Id.* at 600–03. Because the *Davis* court has ruled that DNA testing is generally accepted in the scientific community, appellant's claim for a hearing to determine the admissibility of DNA evidence was properly denied by the trial court.

■■ Appellant's claim that a hearing was required to challenge the method of DNA testing is also disposed of by *Davis.* The *Davis* court held that the manner in which the DNA tests are "conducted goes more to the credibility of the witness and the weight of the evidence, which is in the first instance a discretionary call for the trial court and ultimately for the jury." *Id.* at 603. The trial court did not abuse its discretion in admitting the DNA evidence.

### III. Identification

■■ Appellant argues, in his third point, that the trial court erred in overruling his motion to suppress the voice identification of appellant by two of his victims. Victim Beth H. identified appellant by recognition of his voice in a 1990 lineup. Contrary to appellant's assertion, victim Rose H. visually identified appellant as the man she saw in her room on the night of the rape, and not by his voice. Appellant contends that the out-of-court voice lineup was suggestive and not a reliable means of identification, therefore, the in-court identification was unreliable because there was no independent basis for the identification.

■■ In determining the admissibility of identification evidence, appellant must demonstrate that the police procedures employed were impermissibly suggestive and

that the suggestive procedures made the identification at trial unreliable. *State v. Vinson,* 800 S.W.2d 444, 446 (Mo. banc 1990). A police procedure is impermissibly suggestive when it creates a very substantial likelihood of an irreparable misidentification at trial. *State v. Humphrey,* 789 S.W.2d 186, 190 (Mo.App.E.D.1990). Appellant must clear the suggestiveness hurdle before procuring a reliability review. *Vinson,* 800 S.W.2d at 446.

Appellant's entire argument that the lineup identification was impermissibly suggestive is that "the procedure was suggestive because appellant's voice was so dissimilar to the other voices in the lineup as to single him out." This one conclusory sentence is unsupported by factual argumentation. Appellant's failure to even argue that the police procedures created a very substantial likelihood of irreparable misidentification at trial results in denial of this point. Furthermore, our review of the record disclosed no impermissibly suggestive police procedures.

■■ Appellant instead focuses his argument on factors relating to reliability. Absent a showing of impermissible suggestiveness, these go to the weight of the testimony and not the admissibility of the identifications. *Id.* Moreover, identification by means of appellant's voice is a permissible method. *State v. Mitchell,* 755 S.W.2d 603, 608 (Mo.App.E.D.1988). The trial court did not err in overruling appellant's motion to suppress the identification of appellant.

### IV. Evidence of Drug Use

In his fourth point, appellant argues that the trial court abused its discretion by allowing evidence of drug use by appellant. This matter came up during the prosecution's opening statement and also during the testimony of a police officer. Appellant contends that this was evidence of prior bad acts

---

1. The United States Supreme Court recently clarified that the Federal Rules of Evidence (FRE) and not *Frye* provide the standard for admitting expert testimony in a federal trial in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The *Frye* "general acceptance" standard was superseded by adoption of the FRE. *Daubert,* —— U.S.

at ——, 113 S.Ct. at 2792. A more liberalized approach to admitting opinion testimony is sanctioned by FRE 702's relevance and reliability standard. *Id.* at ——, 113 S.Ct. at 2799. We are bound to follow Missouri precedent as it now stands under the "general acceptance" standard of *Frye,* but note the trend toward the federal approach. *See* footnotes in *Daubert.*

which did not bear any relevance to the crimes charged.

 Evidence of separate, distinct and unrelated crimes is generally inadmissible unless the evidence has a legitimate tendency to establish appellant's guilt of the crime charged. *State v. Kenley,* 693 S.W.2d 79, 81 (Mo. banc 1985). Evidence of separate and distinct crimes is admissible if it tends to establish motive, intent, absence of mistake or accident, a common scheme or plan, identity or the *res gestae. State v. Henderson,* 826 S.W.2d 371, 374 (Mo.App.E.D.1992). Evidence of separate crimes is also admissible when it is inseparable from evidence which implicates the defendant in the crime charged. *Id.*

During his opening statement, the prosecutor remarked that after confessing to the police, appellant agreed to point out the locations of the various crimes. The prosecutor mentioned that appellant was unable to specifically recall the locations of his crimes because "he had a drug problem at that time." After appellant objected, the trial court allowed the reference.

 The trial court has broad discretion in controlling the scope of opening statement. *State v. Wolfe,* 793 S.W.2d 580, 585 (Mo.App.E.D.1990). The inquiry here is whether the prosecutor acted in good faith in mentioning the drug problem. *See State v. White,* 610 S.W.2d 646, 649 (Mo.App.E.D. 1980).

 In this case, the prosecutor's allusion to appellant's drug use was offered as an explanation as to why appellant could not recall the exact location where these crimes took place. It was incumbent upon the prosecutor to offer some reason for appellant not remembering the location of crimes he had confessed to committing. Appellant's drug use explanation was, therefore, inseparable from the crimes being charged. We find the prosecutor's mention of appellant's drug use did not exceed the good faith standard.

Appellant's drug usage was also mentioned during Officer Glenn's testimony. Officer Glenn testified that appellant confessed to the crimes but could not remember the exact locations where the crimes occurred. According to Officer Glenn, after agreeing to drive around and locate the crime scenes, appellant stated that he could not recall the locations because "during this time period ... he had a heavy drug usage." The trial court overruled appellant's objection to the comments.

 A trial court enjoys broad discretion in determining whether to exclude or admit evidence. *State v. O'Dell,* 787 S.W.2d 838, 841 (Mo.App.E.D.1990). The trial court has discretion to determine the materiality and relevancy of evidence offered. *Id.* at 842. Absent a clear abuse of that discretion, an appellate court will not interfere with the trial court's ruling on the admissibility of evidence. *Id.*

Officer Glenn's testimony that appellant used drugs was also necessary to complete the picture of why appellant could not recall the crime scenes. This testimony was not offered for the purposes of linking appellant with illegal drug use and was inseparable from appellant's confession. The trial court did not abuse its discretion in allowing the references to appellant's drug use.

## V. Reasonable Doubt Standard

Appellant's fifth point is one in a long line of attempts to challenge the "reasonable doubt" instruction, MAI–CR3d 302.04. Appellant claims that the portion of the instruction defining "proof beyond a reasonable doubt" as "proof that leaves you firmly convinced of defendant's guilt" improperly lowers the state's burden of proof in a criminal case.

We deny appellant's claim because the Missouri Supreme Court has consistently and repeatedly denied this exact challenge. *State v. Ervin,* 835 S.W.2d 905, 924 (Mo. banc 1992); *State v. Griffin,* 818 S.W.2d 278, 282 (Mo. banc 1991); *State v. Antwine,* 743 S.W.2d 51, 62–63 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). The judgment of the trial court is Affirmed.

CRANDALL, P.J., and GRIMM, J., concur.