

# In the Missouri Court of Appeals Eastern District

## DIVISION TWO

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | ED102438 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of Lincoln County |
| v. | ) | 11L6-CR00543-01 |
| | ) | |
| WILLIAM A. GALVIN, | ) | Honorable James D. Beck |
| | ) | |
| Appellant. | ) | Filed: March 15, 2016 |

## Introduction

William A. Galvin (Defendant) appeals from a sentence and judgment of conviction for second-degree murder after a bench trial. He does not challenge the sufficiency of the evidence supporting the conviction but argues the trial court erred in allowing certain statements by the State during closing argument and in admitting certain testimony. We affirm.

## Background

The State charged Defendant with the class A felony of murder in the second degree.[1] The evidence at the 2014 bench trial showed the following, viewed in a light most favorable to the verdict.[2]

---

[1] The State also charged Defendant with the class D felony of financial exploitation of the elderly, but the State dismissed this count before trial.
[2] State v. Miller, 372 S.W.3d 455, 463 (Mo. banc 2012).

1

Defendant lived with his girlfriend and her mother, Bonnie Brown (the Victim). On May 9, 2011, between 9:00 and 9:30 a.m., Defendant spoke with the teller at his bank, telling her that the Victim had died of an overdose. The teller testified that Defendant smelled of alcohol. Later that morning, around 10:20 a.m., Defendant called 911 to report a break-in and murder, telling the dispatcher that he had just returned home from Springfield to discover the door kicked in and the Victim dead in her bedroom. The responding officers testified Defendant was "noticeably intoxicated." During his interview with police, Defendant alternatively stated that he had returned home from Springfield early in the day and not discovered the Victim until after he had gone to the bank, and that he had discovered the Victim's body and then gone to the bank, calling 911 when he returned home. He later agreed he had not gone to Springfield at all.

Michael Pavia, an inmate with Defendant, testified Defendant told him he had not meant to kill the Victim. Defendant and the Victim had argued in the evening, but had gone their separate ways. He then drank vodka all night, and when the argument resumed in the morning, he had strangled her. When he could not revive her, he kicked in the door to make it look like a break-in.[3]

Sergeant Ryan McCarrick (Sergeant McCarrick) testified to the following. He had been employed with the Lincoln County Sheriff's Office since 2005, and he was a member of the Major Case Squad, which is a group of Metropolitan-area law-enforcement agencies that share manpower to handle serious crimes, such as homicides. Since becoming an investigator, he had had 600 hours of training, including attending the Medical/Legal Death Investigation course at St. Louis University School of Pathology, a four-day Death and Homicide class, a three-day Child Death and Homicide class, two International Homicide Investigator seminars, and the

---

[3] Defendant attempted to mitigate this evidence by introducing testimony from Pavia's former cell-mate that Pavia had told him he read Defendant's discovery documents with the goal of reducing his own sentence.

2

Medical and Coroner's symposium. As part of the training, he had learned signs to look for in determining whether a death was "potentially from a homicide," including strangulation cases. The trial court overruled defense counsel's objection that Sergeant McCarrick was not testifying as an expert, and he testified that in strangulation cases he looked for ligature marks, petechiae[4] in the eyes, and bluish discoloration to the upper torso, head, and neck.

In this case, when Sergeant McCarrick arrived at the scene and observed the body of the Victim, he noted her upper torso, head and neck were blueish, there were red marks on her neck, and there were predominant petechiae in both eyes. Based on his initial observations and the circumstances of the case, he called the Major Case Squad.

Dr. Kamal Sabharwal (Dr. Sabharwal), the medical examiner who performed the autopsy, testified that he had concluded the Victim's cause of death was strangulation and the manner of death was homicide. He testified to the signs of strangulation he noted on the Victim's body. While he also noted the Victim had heart disease, he testified "the [Victim's] other injuries were more significant than the cardiac disease as far as causing her death in this case." By contrast, Defendant presented evidence from Dr. Thomas Young (Dr. Young), a self-employed forensic pathologist, who reviewed the autopsy report, the Victim's medical records, and photographs of the crime scene and autopsy, and concluded the Victim died from heart disease and not strangulation.

Leatha Clark (Clark), the Victim's daughter and Defendant's girlfriend, testified that at the time of the murder, she was in the county jail. Clark testified that when she walked through the house after the murder, she found an empty bottle of vodka in her and Defendant's room. Clark agreed that Defendant was "a drinker," and he had been told to quit after having gall-

---

[4] Dr. Kamal Sabharwal testified that petechiae are pinprick hemorrhages visible on the skin and in the eyes, caused by broken blood vessels.

3

bladder surgery. Defendant had agreed to quit drinking, but Clark confirmed that the empty bottle of vodka in their room was not hers. She further testified the Victim would argue with Defendant about his drinking. She stated that the Victim "liked [Defendant] better when he didn't drink," and that he was loud and made the Victim "nervous" when he drank. On cross-examination, Defendant's counsel introduced letters the Victim had sent to Clark in jail showing the Victim and Defendant got along well.

During closing arguments, defense counsel argued: "this was a family. [The Victim] and [Defendant] lived in the same house and Leatha Clark lived in the same house and they all got along and they all shared expenses and they all laughed together; they cared about each other. There's no evidence to the contrary." In response, the State argued: "This [was] a happy family all living together under one roof except for [the Victim] was scared of [Defendant] because he was a drunk and they would have fights when he would drink." Defense counsel objected on the basis of mischaracterizing the evidence, but the trial court overruled the objection.

At the close of evidence, the trial court found Defendant guilty of second-degree murder and sentenced him to twenty-five years' imprisonment in the Missouri Department of Corrections. This appeal follows.

## Discussion

### Point I

In his first point on appeal, Defendant argues the trial court erred in overruling the defense counsel's objection to the State's assertion during closing arguments that the Victim "was scared of [Defendant] because he was a drunk and they would have fights when he would drink," because it was a misstatement of the facts. We disagree.

4

A trial court has broad discretion in its control over closing arguments, and our review is for an abuse of that discretion. State v. Forrest, 183 S.W.3d 218, 226 (Mo. banc 2006). Error during closing arguments does not require reversal unless it results in prejudice to the defendant. Id. Prejudice requiring reversal occurs only where the defendant can demonstrate there is a reasonable probability the verdict would have been different had the error not been committed. See State v. Taylor, 134 S.W.3d 21, 27 (Mo. banc 2004); see also State v. Parker, 856 S.W.3d 331, 333 (Mo. banc 1993) (burden is on defendant). The prejudicial effect of the comment must be viewed in the context of the entire record. See State v. Riley, 440 S.W.3d 561, 568 (Mo. App. E.D. 2014).

Defendant asserts on appeal that the State's characterization of Defendant during closing arguments as "a drunk" of whom the Victim was "scared" when he drank was both an improper mischaracterization of the evidence and was prejudicial. His argument fails on both fronts. "The State, just like the defense, has wide latitude in drawing inferences from the record when presenting its closing argument." Forrest, 183 S.W.3d at 228. The State has the right to give its view of the evidence and the credibility of witnesses. State v. Miller, 226 S.W.3d 262, 268 (Mo. App. S.D. 2007). Clark testified at trial that Defendant was "a drinker" and that she discovered an empty bottle of vodka under his bed although he had been instructed not to drink following surgery. She stated that Defendant and the Victim argued about his drinking and that his drinking made her "nervous." The words "scared" and "nervous," while not identical, are variations of a theme. We conclude, looking at the whole record, it was not improper for the State to infer the Victim was scared of Defendant when he drank because the evidence included that they argued about his drinking and he made her nervous when he drank. See Clemons v.

5

State, 785 S.W.2d 524, 530 (Mo. banc 1990) (prosecutor may state conclusion if it is fairly drawn from evidence).

Moreover, Defendant was not prejudiced by the State's characterization, because he has not shown that there was a reasonable probability the verdict would have been different had the trial court sustained his objection to the State's comment. See Taylor, 134 S.W.3d at 27. In a bench trial, we presume the trial court disregards improper evidence in reaching its judgment, unless the record was clear the trial court considered and relied on the inadmissible evidence. State v. Ernst, 164 S.W.3d 70, 74-75 (Mo. App. S.D. 2005); see also State v. Brooks, 397 S.W.3d 454, 457 (Mo. App. E.D. 2013). Assuming, *arguendo*, that the State's comment during closing arguments was improper, there was no evidence here that the trial court considered or relied on the State's inference. Rather, we trust that the trial court here was well able to distinguish as necessary between Clark's testimony that Defendant made her mother "nervous" when he drank, and the State's inference that she was "scared" of Defendant when he drank. A trial court is skilled in evaluating each side's argument as they present their analyses of the facts to the court.

The trial court did not abuse its discretion is overruling defense counsel's objections to the State's comment during closing argument. Point denied.

### Point II

In his second point on appeal, Defendant asserts the trial court erred in overruling Defendant's objection to the testimony of Sergeant McCarrick as to the signs of strangulation, on the basis that Sergeant McCarrick was not qualified as an expert witness to discuss medical evidence. This argument is without merit.

6

We review a trial court's decision on the admission of evidence for abuse of discretion. State v. Winfrey, 337 S.W.3d 1, 5 (Mo. banc 2011). An abuse of discretion occurs where the trial court's ruling was "clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." Id. (internal quotation omitted). If we find such error, we reverse only where it "was so prejudicial that it deprived the defendant of a fair trial." Id. (internal quotation omitted).

Here, Defendant characterizes Sergeant McCarrick's testimony as expert medical testimony, arguing that his description of the signs of strangulation was "essentially testi[mony] that [the Victim] died from strangulation," which was testimony that "should have been reserved for a medical doctor." Our review of the record shows that Sergeant McCarrick did not testify the Victim died of strangulation and his testimony did not purport to be medical testimony. Rather, Sergeant McCarrick testified to his basis for suspecting a homicide and his decision to call in a specialized team of investigators, the Major Case Squad.

It is permissible for an officer to testify concerning their observation of a fact based on the witness' experience as a police officer. State v. Woodson, 140 S.W.3d 621, 631 (Mo. App. S.D. 2004). Sergeant McCarrick testified he had been employed with the sheriff's office for ten years and had had 600 hours of training, including courses and seminars in investigating homicides. Through his training and experience, he had learned signs to look for in determining whether a death was potentially a homicide, including strangulation cases. Sergeant McCarrick further testified that when he observed the Victim, he noted her upper torso, head and neck were blueish, there were red marks on her neck, and there was predominant petechiae in both eyes, which was consistent with the signs of strangulation he had learned in his training as a police officer. He did not testify to the Victim's cause of death but rather to why he suspected a

7

homicide and decided to involve the Major Case Squad. Testifying to the signs of a homicide was well within his expertise as an experienced deputy sheriff. See State v. Woodson, 140 S.W.3d 621, 631 (Mo. App. S.D. 2004) (it is permissible for officer to testify to his or her observation of fact founded on witness' experience as a police officer); see also State v. Battle, 415 S.W.3d 783, 788 (Mo. App. E.D. 2013) (officers are allowed to testify to opinion and personal observations based on "extensive law enforcement experience").

The trial court did not abuse its discretion by allowing Sergeant McCarrick to testify to the signs of strangulation. Point denied.

## Conclusion

The judgment and sentence of the trial court is affirmed.

Gary M. Gaertner, Jr., Judge

Philip M. Hess, P.J., concurs.
Angela T. Quigless, J., concurs.

8